NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 260345-U

NOS. 4-26-0345, 4-26-0346 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 13, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| In re J.V. and A.B., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McDonough County |
|       Petitioner-Appellee, | ) | Nos.  20JA39 |
|       v. | ) |      20JA40 |
| Elizabeth B., | ) | |
|       Respondent-Appellant). | ) | Honorable |
| | ) | Heidi A. Benson, |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Lannerd and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, finding the trial court's fitness and best-interest
determinations were not against the manifest weight of the evidence.

¶ 2    In April 2025, the State filed separate petitions to terminate the parental rights of

respondent, Elizabeth B., as to her minor children, J.V. (born in August 2012) and A.B. (born in

May 2020). In this consolidated appeal, respondent challenges the trial court's judgments

terminating her parental rights to both minors. She argues the court's findings that she was unfit

and that termination of her parental rights served the minors' best interests were against the

manifest weight of the evidence. For the reasons that follow, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    On November 10, 2020, the State filed two petitions for adjudication of wardship

in McDonough County on behalf of J.V. and A.B., alleging they were neglected in that their

environment was injurious to their welfare due to a domestic altercation between their parents, pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2020)). On February 18, 2021, the trial court adjudicated the minors neglected. The court subsequently entered a written dispositional order appointing the Illinois Department of Children and Family Services (DCFS) as guardian of the minors and allowed custody of the minors to remain with respondent and her husband. It further ordered respondent to cooperate with her service plan and complete a number of assessments. In April 2023, the minors were removed from respondent's home due to her failure to participate in services required by DCFS.

¶ 5    On April 3, 2025, the State filed separate petitions for termination of respondent's parental rights as to J.V. and A.B. The petitions alleged respondent was unfit because she failed to make reasonable progress toward the return of the minors within two nine-month periods following the adjudication of neglect, specifically, the periods from October 1, 2022, through June 30, 2023, and from July 1, 2023, through March 31, 2024. See 750 ILCS 50/1(D)(m)(ii) (West 2024). Additionally, the petitions alleged respondent was unfit because she failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare. See *id.* § 1(D)(b).

¶ 6                                A. Fitness Hearing

¶ 7    A fitness hearing was conducted on August 14, October 30, and December 11, 2025. Respondent was not present for any of these hearings but was represented by counsel. At the August 14 hearing, respondent's counsel asked for the matter to be continued because she had not been contacted by respondent but had heard from the circuit clerk's office that respondent called the courthouse to say she was in the hospital. The trial court stated it had

received a document from the hospital asking for respondent to be excused but denied the motion because it provided no information as to where she was or why she should be excused. In making its denial, the court noted respondent's disruptive behavior throughout the case. During the hearing, the court additionally received a letter from respondent saying she was too overwhelmed to participate.

¶ 8    Dr. Nicole Hernandez testified that respondent was in the borderline range of intellectual functioning. She diagnosed respondent with histrionic personality disorder, which she stated did not prevent her from parenting safely. She stated respondent's parenting stress index scores were in the average range, indicating she did not experience elevated stress related to the parent-child relationship.

¶ 9    On October 30, 2025, respondent's counsel advised the trial court that respondent no longer wished for counsel to represent her and had refused to speak with her counsel. Counsel told respondent she would need to appear in person to advise the court of her wishes, but respondent did not appear. The court proceeded without her.

¶ 10    Michelle Stephens testified that she was the caseworker assigned by DCFS to J.V. and A.B. from December 2020 until April 2022 and approximately from August 2022 through October 2022. She stated respondent was assigned services related to mental health, parenting, and domestic violence but was unsuccessful in completing them, only engaging in one assigned service, called "Bright Beginnings," throughout Stephens's assignment to the case.

¶ 11    Kayla Whitmer testified that she was the placement worker with DCFS assigned to the cases of J.V. and A.B. from September 2022 through March 2023. She stated respondent was assigned psychological, parenting, and domestic violence counseling as part of her service plan. She provided respondent with the information needed to complete these services and

scheduled some appointments for her, but respondent did not complete any of her assigned services. Whitmer testified that respondent failed to attend one appointment because it was scheduled on a Monday, and respondent "could not make it on Mondays." Whitmer stated respondent was uncooperative, as she was "verbally assaulting," would act aggressively, would not allow her in the house when Whitmer visited to ensure the safety of the minors, and refused to sign the releases required to obtain information about their services. She opined respondent was no closer to having the case closed in March 2023 than she was in September 2022.

¶ 12        Kelsey White testified that she was the child welfare specialist at DCFS assigned as the caseworker for J.V. and A.B. from April 2023 until November 2023. She explained the minors were placed at home with respondent when she began as their caseworker, but were taken into care by DCFS in April 2023. According to White, respondent was usually confrontational when meeting with White, even though respondent had been ordered to cooperate with DCFS as part of her service plan. White stated that she scheduled a psychological evaluation for respondent and drove her to the appointment, where she completed the evaluation. White added that respondent also completed an anger management course. White referred respondent for mental health services as part of her service plan, but respondent was inconsistent in attending her appointments. She stated respondent did not complete the anger management course that was part of her service plan. White stated, despite completion of some services, she did not believe respondent was any closer to getting her minors back in her care in November 2023 than in April 2023 because she was uncooperative with DCFS and refused to complete services, and because respondent's husband was still living with her.

¶ 13        On December 11, 2025, the final day of the fitness hearing, the trial court noted that respondent again did not appear in court.

¶ 14        Echo Duffie testified that she was the child welfare specialist at DCFS assigned as the caseworker for J.V. and A.B. from December 2023 until March 2024. As part of her service plan, respondent needed mental health and substance abuse assessments. Respondent was additionally required to comply with DCFS. Duffie stated respondent completed the mental health assessment before she was assigned to the case and did not complete the substance abuse assessment. She claimed respondent was unresponsive and noncompliant with DCFS. She noted that respondent did not regularly visit with J.V. and A.B. and visited a "very small" number of times. She opined that respondent was no closer to having either minor returned to her at the end of March 2024 than in December 2023 because of her lack of compliance with DCFS and lack of completion of her service plan.

¶ 15        The trial court found by clear and convincing evidence that respondent had failed to make reasonable progress toward the return of her minors in both nine-month periods alleged by the state and set the matter for a best-interests hearing. It noted respondent had severe mental health issues that were not managed or fixed during the time of the case.

¶ 16                              B. Best-Interests Hearing

¶ 17        A best-interests hearing was held on January 22, 2026, with respondent appearing virtually. Duffie testified that she had been the DCFS case manager for J.V., then age 13, and A.B., then age 5, for the past two years. She stated J.V. resided with caregivers, including his maternal uncle, in Macomb, Illinois. She stated the uncle was providing for J.V.'s basic needs, and J.V. demonstrated attachment with his caregivers. She stated J.V. had an individualized education program (IEP) for an intellectual disability, and his caregivers participated in his IEP meetings. Duffie stated that J.V.'s caregiver practiced a faith different from respondent, who was a Jehovah's Witness. She additionally testified that respondent had not formally visited with J.V.

- 5 -

since June 2025. She stated that J.V.'s caregivers were willing to provide permanency to J.V. through adoption.

¶ 18 Duffie testified A.B. had been living with his foster parents since April 2023. She stated his needs were being met by the family, and the family included him in activities like church and other clubs. She testified that A.B. also had an IEP, and his caregivers demonstrated attention to A.B.'s success and participated in IEP meetings. She testified that A.B.'s caregivers expressed an interest in providing A.B. permanency through adoption. A best-interests report authored by Duffie stated respondent had not formally visited with A.B. since June 2025.

¶ 19 Duffie opined that it would be in the best interests of both minors to pursue permanency with their respective caregivers. She also stated that while the mandatory scheduled visits would not continue if respondent's rights were terminated, the caregivers of the minors had expressed a willingness to allow the minors to see each other whenever they wanted.

¶ 20 Respondent testified that her religion was an important value to her, it was the only truth, and it would not be of benefit to J.V. or A.B. to be of a faith that "[would not] ultimately save them." She stated that she was taking medication and regularly attending medical appointments and therapy. She stated she was interested in the education of the minors and contacted the school every day to ensure their well-being. She stated she had not seen the minors for "a very long time," but she had contacted Duffie several times to see them, and Duffie had not responded. She stated Duffie treated her coldly and acted aggressively toward her. She stated she had "a lot of concerns" about the well-being of the minors, and that she was told by "people that [saw] [J.V.] at the school" that he was very unhappy. Respondent stated she did not believe it would be in the best interests of the minors to have her rights terminated because she loved them, she did not "want them involved in false churches" or "false religion," and her rights had

been violated for her beliefs.

¶ 21    Respondent's counsel argued the State had not met its burden because some of the most important issues with regard to juvenile cases included the minors' family connections, customs, and religious ties. She argued A.B. would not have mandated access to his brother or extended family if the case were terminated. She argued religious ties were important to respondent, that efforts should be made to honor that, and that the minors would be torn from values respondent would like to have instilled in them. She stated it was doubtless that respondent had a deep love and concern for the minors and repeatedly showed that love and concern.

¶ 22    The guardian *ad litem* (GAL) argued the State had met its burden. While he acknowledged concerns about the minors' sibling relationship, he argued it was overstated because nothing was preventing their relationship from developing. He also acknowledged the religious component but stated it was not strong enough to overcome the disruptive influence of respondent in the lives of the minors.

¶ 23    The trial court found it was proven by a preponderance of the evidence that it was in the best interests of the minors to terminate the parental rights of respondent. It acknowledged that it was unfortunate that the minors' caregivers were practicing a different religion from respondent, but that this was overcome by the love and care provided by the caregivers. It stated that it would be ideal if the minors had a closer relationship but noted that the caregivers would be open to supporting their relationship. The court agreed that respondent deeply and genuinely loved her children, but it stated that it was immaterial at that point. It stated respondent brought chaos to the lives of the minors, likely stemming from a mental health issue. It stated it was positive respondent was taking medication and seeking treatment but that it was in the best

interests of the minors to allow them to have permanency with their respective caregivers.

¶ 24　　　　This appeal followed.

¶ 25　　　　　　　　　　　　　II. ANALYSIS

¶ 26　　　　　　　　　　　　A. Fitness Findings

¶ 27　　　　Section 2-29(2) of the Juvenile Court Act provides a two-step process to terminate parental rights. 705 ILCS 405/2-29(2) (West 2024). First, the State must prove by clear and convincing evidence that a parent is unfit. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). "Unfit person" is defined in section 1(D) of the Adoption Act as one who, *inter alia*, fails to make reasonable progress toward the return of a minor during any nine-month period following an adjudication of neglect. 750 ILCS 50/1(D)(m)(ii) (West 2024). The supreme court has held that

> "under subsection (m), a parent's 'compliance with DCFS service plans is intimately tied to a parent's progress toward the return of the child, so much so, that where a service plan has been established to correct the conditions that were the basis for the removal of the child from the parent, the failure to make reasonable progress now includes the failure to "substantially" fulfill the terms of that service plan.' " *In re M.I.*, 2016 IL 120232, ¶ 39 (quoting *In re C.N.*, 196 Ill. 2d 181, 217 (2001)).

Additionally, the trial court may consider only evidence from the relevant nine-month period in making its fitness determination. *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046 (2007).

¶ 28　　　　The trial court is in the best position to make a finding of unfitness because "the trial court's opportunity to view and evaluate the parties and their testimony is superior to that of a reviewing court." *In re Brown*, 86 Ill. 2d 147, 152 (1981). "Accordingly, the trial court's findings should be given great deference." *Id.* The appellate court will not reverse a finding of

- 8 -

unfitness unless it is against the manifest weight of the evidence. *Id.* "A court's decision regarding a parent's fitness is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent." *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). Additionally, "[a] parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *Id.* at 349.

¶ 29 Respondent argues the unfitness finding was against the manifest weight of the evidence. First, she argues the trial court demonstrated it did not confine its analysis to the relevant nine-month periods when it stated respondent's mental health issues were not managed "during the entire time of the case." Citing *Reiny S.*, respondent argues this error, standing alone, warrants reversal.

¶ 30 Respondent's reliance on *Reiny S.* is misplaced. In *Reiny S.*, the trial court found the respondent fit. *Reiny S.*, 374 Ill. App. 3d at 1044. The minor's GAL subsequently appealed the trial court's finding because it considered evidence beyond the nine-month period in which the State argued respondent was unfit. *Id.* at 1045. The Illinois Appellate Court, First District, stated:

> "[O]nly evidence from the relevant time period may be considered in determining whether a parent is unfit. [Citation]. This is because reliance upon evidence of any subsequent time period could improperly allow a parent to circumvent her own unfitness because of a bureaucratic delay in bringing her case to trial." *Id.* at 1046 (citing *In re D.F.*, 208 Ill. 2d 223, 235-38 (2003)).

The First District found the trial court's finding was against the manifest weight of the evidence because "the only evidence contained in the record from the relevant time period showed that [the] mother did not make reasonable progress toward reunification," and remanded for a best-

interests hearing. *Id.* at 1047-48.

¶ 31　　　　This is not what happened in this case. Here, respondent appeals a finding by the trial court that she was unfit during the periods specified by the State and argues the court could not consider evidence beyond the nine-month periods to find her unfit. Furthermore, *Reiny S.* states that the court may not *consider* evidence outside the specified period in making its fitness determination, not that it may not *mention* it. *Id.* at 1046. Respondent does not demonstrate the court considered evidence beyond the specified nine-month periods in making its fitness determination. The court said respondent's mental health issues were not managed "during the entire time of the case." The court did not cite specific facts outside the nine-month periods or say they were relevant to its finding. Instead, the court's language suggests respondent's mental health issues were not managed during the two nine-month periods and a period extending beyond them. This suggests there is evidence that could support a finding of unfitness in additional periods but does not mean the court considered it in making its determination with respect to the relevant periods. Respondent does not demonstrate that the court erred by stating respondent had unmanaged mental health issues beyond the periods argued by the State.

¶ 32　　　　　　　　1. *Period from October 2022 Until June 2023*

¶ 33　　　　Respondent argues she made meaningful, concrete progress toward the return of the minors during the first nine-month period, from October 2022 through June 2023. The dispositional order required her to complete a psychological assessment, comply with its recommendations, participate in individual and domestic violence counseling, and cooperate with DCFS. Whitmer testified that respondent's required services included a psychological evaluation, a parenting capacity assessment, and domestic violence counseling. Respondent notes she completed an anger management course on June 24, 2023, and engaged in Bright

Beginnings, an in-home parenting education program, during this period.

¶ 34        Respondent argues her inability to complete a psychological evaluation should be excused because Whitmer scheduled it on a Monday, and respondent could not complete it because she was unable to attend on Mondays. She claims DCFS failed to reschedule, and this failure was attributable to DCFS, not respondent. She further claims a "parent's progress cannot fairly be measured against a standard that DCFS itself failed to facilitate," citing *In re B.W.*, 282 Ill. App. 3d 680, 682 (1996).

¶ 35        Respondent's reliance on *B.W.* is misplaced. In *B.W.*, the Illinois Appellate Court, Third District, stated that the question of whether a parent has made suitable progress toward the return of her child after an adjudication of neglect is determined on an objective basis, measured by the parent's compliance with the trial court's directives or the service plan. *Id.* at 683. Nowhere does it state a respondent can be excused from this standard because DCFS did not adequately facilitate her completion of each part of the service plan.

¶ 36        Additionally, there is ample evidence that DCFS did facilitate respondent's completion of the plan. Whitmer testified that she scheduled appointments for respondent and provided her with the information needed to complete the required services, but respondent did not complete any services while Whitmer was assigned to the case. White testified that she scheduled a service for respondent and drove her to the appointment. She additionally referred her for mental health services. Instead, respondent impeded the ability of DCFS to facilitate her progress. She was verbally aggressive toward both Whitmer and White and refused to sign the releases required for DCFS to obtain information about her services. Whitmer, White, and Duffie all testified to respondent's lack of cooperation with DCFS. We refuse to excuse respondent's lack of progress due to the failure of DCFS to facilitate her completion of the service plan when

she was consistently uncooperative when they did try to help her complete the plan.

¶ 37        Respondent also argues the trial court ignored the objective obstacles she faced, such as having borderline intellectual functioning and deficits in processing speed and rational reasoning. She states that holding her to the same standard as a parent without these limitations without accommodations is inconsistent with the case-specific nature of the reasonable progress inquiry. She cites no case or statute for her claim that the standard is different for respondents with mental health issues. Instead, *B.W.* states that the standard is objective and measured by the parent's compliance with the court's directives or the service plan. *Id.* Similarly, this court has found, "Because reasonable *progress* is an objective standard distinct from reasonable *efforts*, [the] respondent's intellectual disability does not affect our analysis." (Emphases in original.) *In re M.F.*, 2024 IL App (4th) 241074-U, ¶ 70.

¶ 38        Demonstrating that respondent performed one part of the service plan and engaged in one other is insufficient to show the trial court's unfitness finding was against the manifest weight of the evidence. Respondent did not complete a psychological evaluation, a parenting capacity assessment, or domestic violence counseling. She was also uncooperative with DCFS. Whitmer testified respondent would verbally assault her, act aggressively, and not allow her in the house when she visited to ensure the safety of the minors. Respondent fails to demonstrate the court's finding she failed to make reasonable progress during this period was against the manifest weight of the evidence.

¶ 39                        *2. Period from July 2023 Until March 2024*

¶ 40        Though it is sufficient to find respondent was unfit under the first nine-month period, we additionally address the second, in which respondent argues she substantially progressed toward the return of the minors to her care. She argues that because she

independently initiated medication management, initiated mental health counseling, and completed a psychological evaluation in October 2023, the trial court's unfitness determination was against the manifest weight of the evidence. Respondent also argues that the court's stated basis for finding her unfit—that her mental issues were not managed or resolved—was the incorrect legal standard. Instead, the proper standard was whether she made reasonable progress toward the return of the minors. Citing *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17, respondent contends her actions demonstrated an upward trajectory of engagement, thus satisfying this standard.

¶ 41     The trial court's finding of unfitness based on the second relevant nine-month period was not against the manifest weight of the evidence. While respondent did attend some mental health services in August 2023, White testified that her attendance was sporadic and she frequently missed appointments. While respondent began medication management in October 2023, Duffie testified that respondent had not been complying with medication management since prior to receiving the case in December 2023. Respondent never completed the required substance abuse assessment, and her visitation with the minors was inconsistent during this period. Additionally, respondent was uncooperative with DCFS, refusing to provide contact information and often being unresponsive and uninterested in communicating with DCFS. It is difficult to characterize respondent's progress during this period as demonstrating reasonable progress or an upward trajectory of engagement, and the court's finding that respondent was unfit during this period was not against the manifest weight of the evidence.

¶ 42                    B. Best-Interests Finding

¶ 43     After the trial court makes a finding of unfitness, the State must prove by a preponderance of the evidence it is in the child's best interests that parental rights be terminated.

- 13 -

*In re D.T.*, 212 Ill. 2d 347, 366 (2004). At this stage, "[t]he issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *Id.* at 364. In making a best-interests determination, the court must consider the following factors set forth in section 1-3(4.05) of the Act (705 ILCS 405/1-3(4.05) (West 2024)):

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals, including the child's wishes regarding available permanency options and the child's wishes regarding maintaining connections with parents, siblings, and other relatives;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for

- 14 -

stability and continuity of relationships with parent figures, siblings, and other

relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child, including

willingness to provide permanency to the child, either through subsidized

guardianship or through adoption."

On review, the appellate court will not disturb a trial court's finding that termination is in the

child's best interests unless it is against the manifest weight of the evidence, meaning the

opposite conclusion is clearly evident. *In re H.D.*, 343 Ill. App. 3d 483, 494 (2003); *In re T.A.*,

359 Ill. App. 3d 953, 960 (2005).

¶ 44        Respondent argues the trial court's finding it was in the best interests of the

minors to terminate her parental rights was against the manifest weight of the evidence.

Specifically, she argues (1) the minors' background and familial, cultural, and religious ties;

(2) the minors' sense of attachments; (3) the uniqueness of the family; and (4) the risks of

substitute care all weigh against termination of her parental rights.

¶ 45        Respondent essentially asks us to reweigh the evidence presented to the trial

court. This is not the purview of the reviewing court. *In re K.B.*, 314 Ill. App. 3d 739, 748

(2000). She fails to demonstrate that the trial court's best-interests determination was against the

manifest weight of the evidence. For each factor respondent argues weighs against termination,

there are either facts demonstrating they weigh in favor of termination, or there are other factors

that outweigh them.

¶ 46        Respondent argues the minors' sibling relationship will be harmed because court-

enforceable mechanisms for maintaining sibling contact will cease. This is mitigated by the fact that the foster families live in close proximity in Macomb and have both expressed a willingness to facilitate visits between the siblings whenever requested. If there is any threat to the siblings' relationship compared to their prior status, it appears to be minimal.

¶ 47 Respondent's uniqueness argument centers around her demonstrated love for the minors and her recent compliance with medical services. She argues her mental health instability should not extinguish her parental rights. While respondent demonstrated love for the minors, they were also in need of stability, permanency, adequate shelter, educational support, medical support, and other basic necessities. It was demonstrated that both caregivers were able and willing to provide all of these, in addition to love and affection. Respondent, on the other hand, was unable to provide the minors with a nondisruptive environment, demonstrated an inability to direct the behaviors of the minors, and did not regularly visit the minors. At the time of the hearing, respondent had not formally visited the minors in approximately seven months.

¶ 48 Respondent's argument that the risks attendant to entering substitute care weigh against termination is unconvincing. She argues both minors have special needs and IEPs, and she has demonstrated the devotion required to attend to such needs. In this case, the record demonstrates that both caregivers are able and willing to provide the stability, consistency, and active engagement the minors' special needs require. Both of them attend the respective minors' IEP meetings and facilitate their ability to complete recommended assessments. The attendant risks due to the minors' special needs appear to be minimal in this case.

¶ 49 Respondent also argues her faith is of profound importance to her, and the minors' caregivers do not practice the same faith, weighing against termination. While it would be preferable for the minors to be in an environment consistent with their prior religious ties,

respondent's wishes do not hold weight at this stage. Once the parent has been found unfit, all considerations, including the parent's rights, yield to the best interests of the child. *D.T.*, 212 Ill. 2d at 363-64. In discussing J.V., the trial court found it unfortunate that his uncle practiced a different faith, but "what is important is that [J.V.] is loved and is cared for," and "it's in his best interest to stay there." With regards to A.B., the court acknowledged that a same-faith relative placement would have been ideal, but none was available. It determined that this was outweighed, in part, because A.B. had found a loving and caring placement that would provide for his special needs.

¶ 50          The trial court concluded:

> "The Court agrees again with [respondent's attorney] that [respondent] deeply and genuinely loves her children. That is not an issue. [Respondent] before the Court had to mute her was saying something about drugs. The Court has never had a concern with regard to [respondent] and the use of illegal substances. But as—well, as this hearing has demonstrated and [the GAL] has alluded to and we heard lots of examples of in the fitness portion, [respondent] brings chaos, and it is likely not her fault. Likely, a mental health issue. And I did hear her say really for the first time that perhaps she's medicated now which was definitely a positive, and I don't want to take anything away from her seeking out mental health treatment and being medication compliant.
>
> But it is in the best interest of the kids that we allow them to have the permanency of staying with the families that have been nurturing them. Both of them have been blooming where they have been planted and, although it's not perfect in terms of a relative placement with the same religion and we weren't

able to place the boys together, the Court still finds that it's in their best interests to be adopted by their families."

¶ 51       Despite the factors respondent argues weigh against termination, the trial court found the evidence overall established that it was in the best interests of the minors to terminate respondent's parental rights.

¶ 52       The record demonstrates that it was not against the manifest weight of the evidence for the trial court to find it in the best interests of the minors to terminate respondent's parental rights.

¶ 53                         III. CONCLUSION

¶ 54       For the reasons stated, we affirm the trial court's judgment.

¶ 55       Affirmed.